**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| AMIR BRANDY | ) |
| | ) |
|      Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF SAINT LOUIS, MISSOURI, | )  Cause No.: 4:18-cv-01674 |
| COL. JOHN HAYDEN, in his | ) |
| individual and official capacities, and | )  JURY TRIAL DEMANDED |
| OFFICER WILLIAM OLSTEN, in his | ) |
| individual and official capacities. | ) |
| | ) |
|      Defendants. | ) |

## COMPLAINT

On September 29, 2017, Officer Olsten of the St. Louis Municipal Police Department pepper sprayed Plaintiff, Amir Brandy ("Mr. Brandy") without warning, without justification, and for punitive reasons while Chief Hayden looked on. Mr. Brandy was not breaking any laws and was exercising his First Amendment right to question the police's use of a Taser without warning and unjustified use of excessive force against an elderly clergyman.

### JURISDICTION AND VENUE

1.    Plaintiff brings this claim pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, and the First and Fourth Amendments, as incorporated as against States and their municipal divisions through the Fourteenth Amendment.

2.    The jurisdiction of this Court is proper pursuant to 28 U.S.C. § 1331 because Plaintiff's action arises under the Constitution of the United States and § 1343(a)(3) to redress the deprivation of rights secured by the Constitution of the United States.

3.     Venue is proper in the United States District Court for the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in the City of St. Louis.

4.     Divisional venue is proper in the Eastern Division because a substantial part of the events leading to the claims for relief arose in the City of St. Louis and Defendants reside in the Eastern Division. E.D. Mo. L.R. 2.07(A)(1), (B)(1).

5.     This Court has supplemental jurisdiction over the included Missouri state law claims pursuant to 28 U.S.C. §1367.

6.     Plaintiff demands a trial by jury pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

7.     Defendant the City of St. Louis, Missouri (hereinafter, "City of St. Louis") is a first-class city, and a political subdivision of the State of Missouri duly organized under the Constitution of Missouri.

8.     The St. Louis Metropolitan Police Department ("SLMPD") is an instrumentality of the City of St. Louis, Missouri organized and controlled pursuant to the Statutes of the State of Missouri.

9.     The Public Facilities Protection Corporation of the City of St. Louis insures the SLMPD.

10.     John Hayden is the current Chief of Police officer of the SLMPD. Mr. Hayden has the rank of colonel. Mr. Hayden was on the ground supervising SLMPD officers during the events of September 29, 2017. At the time, his rank was major.

11.     William Olsten is employed as a police officer with the SLMPD. Mr. Olsten was on duty and on the scene during the events of September 29, 2017.

12.     Plaintiff is a resident of St. Louis County.

## FACTS

### A.     Backdrop of Stockley Verdict

13.     On Friday, September 15, 2017, after a four-day bench trial, a Missouri Circuit Court Judge acquitted Officer Jason Stockley of the first-degree murder of Anthony Lamar Smith. *See* Exh. A, Stockley Verdict.

14.     This acquittal shocked many in the St. Louis community as an audio recording submitted into evidence in the trial captured Officer Stockley saying "we're killing this motherfucker, don't you know" in reference to Mr. Smith. *Id*. at 5.

15.      Further, evidence showed that during the incident Officer Stockley was in possession of an assault rifle that had not been issued to him by the SLMPD. *Id*. at 23.

16.     In addition, Officer Stockley claimed to find a gun in Mr. Smith's car after he killed Mr. Smith. *Id*. at 25.

17.     Only Officer Stockley's DNA was found on the gun, leading many, including the Circuit Attorney of the City of St. Louis, to believe that Stockley planted the gun on Mr. Smith after Mr. Smith's death, in an effort to justify the killing. *Id*. at 12.

18.     At trial, Officer Stockley's partner did not testify in Stockley's defense. Rather, the partner invoked his Fifth Amendment right against self-incrimination.[1]

---

[1] *See* Joel Currier, *Partner of Ex-St. Louis Cop Charged with Murder is Given Immunity, Ordered to Testify*, St. Louis Post-Dispatch, Jul 27, 2016, available at http://www.stltoday.com/news/local/crime-and-courts/partner-of-ex-st-louis-cop-charged-with-murder-is/article_b85140b8-3744-55fb-83ee-3d9474cc70b3.html.

### B.     Protests Begin After the Verdict

19.     Following the announcement of the Stockley Verdict, public protests began at multiple locations in St. Louis and surrounding communities.

20.     To many in the St. Louis community, Officer Stockley's acquittal was yet another example of white St. Louis-area police officers killing African-American citizens with impunity.

21.     Further, in the view of the protestors, the acquittal further supported their view that the American criminal justice system does not believe that Black lives matter.

22.     In response to the protests, St. Louis Metropolitan police officers amassed at several protests wearing military-like tactical dress, helmets, batons, and full-body riot shields and carrying chemicals, such as tear gas, skunk, inert smoke, pepper gas, pepper pellets, xylyl bromide, and/or similar substances (collectively, "chemical agents").

23.     This is in stark contrast to SLMPD's appearance at a multitude of other un-permitted protests where the police themselves are not the target of the protest, including an anti-Donald Trump march on November 13, 2016, the St. Louis Women's March on January 21, 2017, the St. Louis LGBTQIA March and Rally on February 22, 2017, and the St. Louis March for Science on April 22, 2017.

24.     Virtually all of the protests were non-violent.

25.     On three occasions, a handful of protesters committed minor property damage, including broken windows and broken flower pots.

26.     During the Stockley protests, SLMPD police officers *without warning* deployed chemical agents against individuals observing, recording, or participating in protest activity, including but not limited to the following:

a.      The afternoon of Friday, September 15, 2017, near the intersection of Clark and Tucker Avenues.

b.      The evening of Friday, September 15, 2017, near the intersection of McPherson and Euclid Avenues.

c.      The evening of Friday, September 15, 2017, near the intersection of Waterman and Kingshighway Boulevards.

d.      The evening of Friday, September 15, 2017, near the intersection of Lindell and Euclid Avenues.

e.      The evening of Friday, September 15, 2017, near the intersection of Euclid and Maryland Avenues.

f.      The evening of Friday, September 15, 2017, near the intersection of Lindell and Kingshighway Boulevards.

g.      The evening of Friday, September 15, 2017, near the intersection of Euclid Avenue and Pershing Place.

h.      The evening of Friday, September 15, 2017, on Hortense Place.

i.      The evening of Sunday, September 17, 2017, near the intersection of Tucker Boulevard and Washington Avenue.

j.      The evening of September 29, 2017 outside of Busch Stadium.

27.     These incidents are consistent with the pattern and practice of SLMPD of indiscriminately using chemical agents without warning.

### C.  Post-Ferguson Federal Court Proceedings

28.  On December 11, 2014, a federal judge in this District issued a temporary restraining order enjoining the SLMPD from enforcing any rule, policy, or practice that grants law enforcement officials the authority or discretion to:

(1)  utilize tear gas, inert smoke, pepper gas, or other chemical agents (collectively, "chemical agents") for the purpose of dispersing groups of individuals who are engaged in peaceful, non-criminal activity in the City of St. Louis or in the County of St. Louis

> (a)  without first issuing clear and unambiguous warnings that such chemical agents will be utilized;
> (b)  without providing the individuals sufficient opportunity to heed the warnings and exit the area;
> (c)  without minimizing the impact of such chemical agents on individuals who are complying with lawful law enforcement commands; and
> (d)  without ensuring that there is a means of safe egress from the area that is available to the individuals; and

(2)  utilize chemical agents on individuals engaged in peaceful, non-criminal activity in the City of St. Louis or in the County of St. Louis for the purpose of frightening them or punishing them for exercising their constitutional rights.

*See* Exh. B, Temporary Restraining Order in *Templeton v. Dotson*, No. 4:14-cv-02019 (E.D. Mo. Dec. 11, 2014) at 3.

29.  This suit was in response to SLMPD firing chemical agents into a business where peaceful protestors had congregated without allowing the protestors to leave.

30.  The City entered into a settlement agreement on March 25, 2015, where it agreed as follows:

A.  Defendants and their agents, servants, employees, and representatives, will not enforce any rule, policy, or practice that grants law enforcement officials the authority or discretion to:

> (1)  utilize tear gas, inert smoke, pepper gas, or other chemical agents (collectively, "chemical agents") for the purpose of dispersing groups of individuals who are engaged in non-criminal activity:

(a)     without first issuing clear and unambiguous warnings that such chemical agents will be utilized;

(b)     without providing the individuals sufficient opportunity to heed the warnings and exit the area;

(c)     without reasonably attempting to minimize the impact of such chemical agents on individuals who are complying with lawful law enforcement commands; and

(d)     without ensuring that there is a means of safe egress from the area that is available to the individuals and announcing this means of egress to the group of individuals.

(2)     utilize chemical agents on individuals engaged in non-criminal activity for the purpose of frightening them or punishing them for exercising their constitutional rights.

B.     Provided, however, that Paragraph A hereof shall not be applicable to situations that turn violent and persons at the scene present an imminent threat of bodily harm to persons or damage to property, and when law enforcement officials must defend themselves or other persons or property against such imminent threat.

See Exh. C, Settlement Agreement in *Templeton v. Dotson*, No. 4:14-cv-02019 (E.D. Mo. Mar. 25, 2015) at 1-2.

### D.     SLMPD Violations of the Consent Decree

31.     Less than two months after entering into this Consent Decree, SLMPD began to violate the Decree.

32.     On May 19, 2015, in response to protests over the St. Louis Circuit Attorney's office's refusal to charge another SLMPD officer for killing another African-American man, SLMPD officers deployed chemical agents against peaceful, non-criminal protestors without warning. *See* Exh. D, Transcript of Testimony, Volume 1, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Oct. 18, 2017) at 69.

33.     On August 19, 2015, a protest occurred because SLMPD officers killed another African-American man in the Fountain Park neighborhood. According to the testimony of Sarah Molina, a local attorney, SLMPD officers indiscriminately used chemical agents without giving

7

an audible and intelligible warning at the intersection of Walton Avenue and Page Boulevard. *Id*. at 50-52. Molina testified that SLMPD officers fired chemical agents at her without giving her an opportunity to leave. *Id.* SLMPD officers continued using chemical agents against people fleeing the area and even fired chemical agents at people peacefully standing on or in their own properties. *Id.* Thirty minutes after the protests had dissipated, SLMPD officers returned and fired chemical agents at Ms. Molina, who was standing on property that she owns. *Id.*

34.     On July 21, 2017, SLMPD officers used chemical agents against people protesting the treatment of detainees in the St. Louis City Workhouse. *Id.* at 71, 91. Although a few people did engage in unlawful activity earlier in the night, SLMPD officers pepper sprayed numerous people, none of whom were involved in criminal activity or were even at the same location as the criminal activity. These protesters were engaged in non-violent protesting when SLMPD officers sprayed them with chemical agents. *Id.*

### E.     The September 29, 2017 Protest

35.     This pattern and practice of utilizing chemical agents on individuals engaged in peaceful, non-criminal activity continued on September 29, 2017.

36.     On September 29, 2017, at around 7:00 PM, individuals began gathering and protesting outside Busch Stadium while a St. Louis Cardinals game took place inside the stadium.

37.     Throughout the course of several hours, the protestors marched up and down various streets of downtown protesting police violence. SLMPD blocked street intersections and regulated pedestrian and traffic flow during the demonstrations.

38.     At some point during in the evening, but prior to any arrests, protestors lawfully and peacefully entered Busch Stadium with tickets and unfurled a giant banner as a sign of protest of police violence.

39.     Shortly thereafter, the protestors inside Busch Stadium voluntarily left the premises and rejoined other protestors marching near the Stadium and Ballpark Village. These marches were peaceful.

40.     SLMPD's Civil Disobedience Team appeared on the scene to join uniformed and bicycle SLMPD officers already present. To this point, there had been no reports of violence attributable to the protestors.

41.     SLMPD's Civil Disobedience Team was comprised of officers wearing military-like tactical dress, including helmets. These officers carried long wooden batons and full-body riot shields.

42.     Around 9:00 PM, a majority of protestors who had been marching along various streets in downtown began making their way back towards Busch Stadium moving south on Broadway towards the intersection of Walnut Street and Broadway.

43.     Soon after the protestors arrived around the intersection of Broadway and Walnut, SLMPD began indiscriminately using pepper spray on civilians without provocation of violence or criminal behavior. Among the civilians SLMPD pepper sprayed were members of the clergy, elected officials, and disabled persons.

44.     Video evidence shows that protestors acted peacefully and calmly when a few protestors crossed the intersection of Walnut walking south.

45.     Instantly and without warning, an officer wearing an SLMPD baseball cap violently threw Reverend Darryl Gray to the ground breaking the Reverend's glasses.

46.     Instantly, protestors began to voice their disapproval of the violent excessive force used against Reverend Gray. Up until that moment, the protest was both calm and rather quiet.

47.     In response to the SLMPD's unwarranted escalation, many people, including protestors, elected officials, people who were just attending the baseball game, and members of the media began to loudly question why the police had decided to use violence when it was clearly unwarranted.

48.     At that time, two officers began to chase one of the protestors, Calvin Kennedy.

49.     Video evidence shows that Mr. Kennedy was not being violent toward any officer. Within 15 seconds, one officer had a hold of Mr. Kennedy's T-shirt.

50.     The video evidence also shows that the officers did not give Mr. Kennedy any verbal commands.

51.     Without warning, one of the officers proceeded to shoot Mr. Kennedy with a Taser while Mr. Kennedy was being grabbed by the officer.

52.     In reaction to the Tasering, protestors began demanding answers to why SLMPD deployed a weapon that has been cited as a factor in over 1,000 deaths.[2]

53.     In response to the complaints, Officer Olsten can be heard antagonizing the protestors. He is heard yelling at a protestor "Come and fuck me up then" and is seen moving toward the protestor. Two SLMPD officers are observed trying to grab Officer Olsten and calm him down and move him away from the crowd.

54.     The only white shirt supervisor seen during the course of the video is Chief Hayden, who is seen standing approximately five feet to the right of Officer Olsten.

---

[2] See *Reuters Finds 1,005 Deaths in U.S. involving Tasers, Largest Accounting to Date*, Reuters, Aug 22, 2017, available at:
https://www.reuters.com/article/us-axon-taser-toll/reuters-finds-1005-deaths-in-u-s-involving-tasers-largest-accounting-to-date-idUSKCN1B21AH

55.     Officer Olsten is observed getting more and more agitated as he very pronouncedly chomps on his gum and begins to flex his body.

56.     Although some protestors are observed harshly criticizing the SLMPD's violent arrest and Taserings, Officer Olsten is never in any danger. Further, Officer Olsten was not trying to extricate himself from a dangerous situation.

57.     Then, without warning, Officer Olsten pulls out a large fogger like canister of pepper spray.

58.     Officer Olsten did not give any dispersal order or warning prior to using the pepper spray.

59.     He fired a broad stream of spray hitting Mr. Brandy and three other people, including an elected Democratic Committeeman and a woman in a wheelchair.

60.     After pepper spraying these people, Officer Olsten made no attempt to effectuate any arrests. He just calmly walked away after delivering the punitive chemical munitions.

61.     The pepper spray worked as intended as Mr. Brandy began to feel excruciating pain. His eyes began to burn. Mucus ran from his nose. His breathing became labored.

62.     In response to the deployment of pepper spray, SLMPD released a statement that read in part, "Officers deploy tactics when criminal activity arises and escalation depends on the level of aggression. […] Pepper spray is a non-lethal tool used when unlawful behavior occurs to protect life and property."[3]

63.     This statement flies in the face of what really happened. There was no unlawful behavior that required pepper spraying. At worst, individuals may have been jaywalking. No life

---

[3] *See* Erin Heffernan, *St. Louis Faith Leaders Criticize Arrest, Pepper-Spraying of Clergyman at Protest*, St. Louis Post-Dispatch, Oct 3, 2017, available at https://www.stltoday.com/news/local/metro/st-louis-faith-leaders-criticize-arrest-pepper-spraying-of-clergyman/article_f065d923-634d-526a-8b0f-45dc443ec1cb.html.

or property was in danger until SLMPD Tasered a person without warning and then used pepper spray in a punitive manner.

64.     During this whole incident, Chief Hayden can be observed in the middle of the officers wearing a white shirt indicating that he is a supervisor. Chief Hayden takes no steps to prevent his officers from inflicting punishment on peaceful protestors and members of the media. In fact, Chief Hayden is observed using a cell phone to record the activities and the police response.

## F.     Federal Court Injunctive Relief

65.     On November 15, 2017, a judge in this District barred SLMPD from using many of the tactics described in this complaint. *See* Exh. E, Memorandum and Order of Preliminary Injunction, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Nov. 15, 2017).

66.     The Court found that "[p]rotest activity began shortly after the announcement of the verdict on the morning of September 15, 2017. Protesters assembled in front of the state courthouse downtown near Tucker and Market streets. They did not have a permit to protest because the City of St. Louis does not require, and will not provide, a permit for protests." *Id*. at 2.

67.     In an attempt to defend the SLMPD's actions, the City's attorney "stated during closing arguments that 'the police have the right to tell people, at this point, we're done for the evening; there's no – no more assembling; this assembly is over.'" *Id*. at 37. Not surprisingly, the Court did not adopt this rationale as a basis for the arrests and the use of chemical agents.

68. The Court made the following findings:

a.     Plaintiffs are likely to prevail on the merits of their claims that the policies or customs of defendant discussed below violate the constitutional rights of plaintiffs. *Id*. at 35-36.

12

b.     Plaintiffs have presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant's custom or policy is to permit any officer to declare an unlawful assembly in the absence of the force or violence requirement of St. Louis City Ordinance 17.16.275 and Mo. Rev. Stat. § 574.060, in violation of plaintiffs' First and Fourth Amendment rights. *Id*. at 36.

c.     Plaintiffs have presented sufficient evidence for purposes of awarding preliminary injunctive relief that defendant's custom or policy of committing discretionary authority to police officers to declare unlawful assemblies in the absence of any threat of force or violent activity provides no notice to citizens of what conduct is unlawful, and it permits officers to arbitrarily declare "there's no more assembling." *Id*. at 37-38. Plaintiffs have presented sufficient evidence at this stage of the proceedings that this discretion was in fact exercised in such a manner in violation of plaintiffs' constitutional rights. *Id*.

d.     Similarly, Plaintiffs have presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant's custom or policy is to permit officers to issue vague dispersal orders to protesters exercising their first amendment rights in an arbitrary and retaliatory way and then to enforce those dispersal orders without sufficient notice and opportunity to comply before being subjected to uses of force or arrest, in violation of Plaintiffs' First and Fourth Amendment rights. *Id*. at 39.

e.     Plaintiffs presented sufficient, credible evidence for purposes of awarding preliminary injunctive relief that defendant has a custom or policy, in the absence of exigent circumstances, of issuing dispersal orders to citizens engaged in expressive activity critical of police which are either too remote in time and/or too vaguely worded to provide citizens with sufficient notice and a reasonable opportunity to comply, inaudible and/or not

13

repeated with sufficient frequency and/or by a sufficient number of officers to provide citizens with sufficient notice and a reasonable opportunity to comply, contradictory and inconsistent, not uniformly enforced, and retaliatory. *Id*. at 40.

f.      Plaintiffs have also presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant has a custom or policy of using chemical agents without warning on citizens engaged in expressive activity that is critical of police or who are recording police in retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments. *Id*. at 41.

g.      The City's custom or policy of authorizing the use of hand-held mace against non-violent protesters with no warning or opportunity to comply and in the absence of probable cause or exigent circumstances impermissibly circumvents the protections afforded by the *Templeton* settlement agreement and vests individual officers with unfettered discretion to exercise that authority in an arbitrary and retaliatory manner in violation of constitutional rights. *Id*. at 43-44.

h.      Plaintiffs' evidence — both video and testimony — shows that officers have exercised their discretion in an arbitrary and retaliatory fashion to punish protesters for voicing criticism of police or recording police conduct. When all of the evidence is considered, plaintiffs have met their burden of showing that they are likely to succeed on their claim that defendant has a custom or policy of deploying hand held pepper spray against citizens engaged in recording police or in expressive activity critical of police in retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments. *Id*. 44.

i.      Plaintiffs have also presented sufficient evidence at this preliminary stage of the proceedings that the aforementioned customs or policies of defendant caused the violations of plaintiff's constitutional rights. *Id*. 44. That is because "it is well-settled law that a loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" and "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 691 (8th Cir. 2008) (internal quotation marks and citations omitted), overruled on other grounds, *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (2012). *Id*. 44-45.

69.     Upon information and belief, senior officials of the SLMPD, including Defendant Hayden were directing such actions and conduct and/or tacitly accepting and encouraging such conduct by not preventing officers from engaging in such conduct and by not disciplining them when they did engage in such actions and conduct.

**<u>COUNT I</u>**
**First Amendment Retaliation – Cognizable Under 42 U.S.C. § 1983**
**(Against All Defendants)**

70.     Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

71.     Plaintiff has a fundamental right to assemble and express Plaintiff's views protected by the freedom of association and freedom of speech clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

72.     Defendants' actions violated Plaintiff's rights under the First Amendment to freedom of speech and freedom of assembly by interfering with Plaintiff's ability to associate freely in public and express Plaintiff's views as part of a peaceful demonstration.

73.     Observing and recording public protests, and the police response to those protests, is also a legitimate means of gathering information for public dissemination that is protected by the freedom of speech and freedom of the press clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

74.     Defendants' actions violated Plaintiff's First Amendment rights to freedom of the press and freedom of speech by interfering with Plaintiff's ability to gather information and cover a matter of public interest.

75.     Defendants engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Plaintiff's First Amendment rights.

76.     As a direct and proximate result of Defendants' unlawful actions described herein, Plaintiff suffered damages including: physical injury, emotional trauma, great concern for Plaintiff's own safety; fear, apprehension, depression, anxiety, consternation and emotional distress;

77.     Additionally, Defendants' actions described herein have had a chilling effect on Plaintiff, who is now less likely to participate in free public discourse.

78.     At all times, Defendants were acting under color of state law.

79.     If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

**<u>COUNT II</u>**
**42 U.S.C. § 1983 – First and Fourteenth Amendment Violations**
**(Against Defendants Olsten and Hayden)**

80.     Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

81.    Plaintiff has a fundamental right to assemble and express Plaintiff's views protected by the freedom of association and freedom of speech clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

82.    Defendants' actions violated Plaintiff's rights under the First Amendment to freedom of speech and freedom of assembly by interfering with Plaintiff's ability to associate freely in public and express Plaintiff's views as part of a peaceful demonstration.

83.    Observing and recording public protests, and the police response to those protests, is also a legitimate means of gathering information for public dissemination that is protected by the freedom of speech and freedom of the press clauses of the First Amendment, as applied to the states under the Fourteenth Amendment to the United States Constitution.

84.    Defendants' actions violated Plaintiff's First Amendment rights to freedom of the press and freedom of speech by interfering with Plaintiff's ability to gather information and cover a matter of public interest.

85.    Defendants engaged in these unlawful actions willfully and knowingly, acting with reckless or deliberate indifference to Plaintiff's First Amendment rights.

86.    As a direct and proximate result of Defendants' unlawful actions described herein, Plaintiff suffered damages including: physical injury, emotional trauma, great concern for Plaintiff's own safety; fear, apprehension, depression, anxiety, consternation and emotional distress;

87.    Additionally, Defendants' actions described herein have had a chilling effect on Plaintiff, who is now less likely to participate in free public discourse.

88.    At all times, Defendants were acting under color of state law.

89.     If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

**COUNT III**
**Unlawful Retaliation in Violation of The First Amendment**
**Cognizable Under 42 U.S.C. § 1983**
**(Against All Defendants)**

90.     Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

91.     Plaintiff was engaged in lawful First Amendment conduct of free speech and assembly.

92.     In retaliation for this exercise of Plaintiff's First Amendment rights, Defendants deployed chemical agents against Plaintiff and assaulted Plaintiff.

93.     Defendants' conduct would chill a person of ordinary firmness from continuing to engage in lawful First Amendment activity of free speech and assembly.

94.     Defendants acted in retaliation against Plaintiff, and for the purpose of deterring Plaintiff from exercising Plaintiff's rights under the First Amendment to free speech and assembly.

95.     The conduct of Defendants violates the First Amendment in the United States Constitution in that Defendants deprived Plaintiff of Plaintiff's right to free speech and assembly by acting in retaliation against Plaintiff for the purpose of deterring Plaintiff from engaging in lawful protests.

96.     As a direct and proximate result of the conduct of Defendants, Plaintiff suffered injuries and damages including but not limited to: physical injury, emotional trauma, great concern for Plaintiff's own safety; fear, apprehension, depression, anxiety, consternation and emotional distress; suppression of their First Amendment right to freedom of speech and assembly, punishment for exercising Plaintiff's First Amendment rights; and loss of faith in society.

97.     The acts of Defendants described herein were intentional, wanton, malicious, and/or were callously indifferent to the rights of Plaintiff, thus entitling Plaintiff to an award of punitive damages against Defendants.

98.     If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

**COUNT IV**
**42 U.S.C. § 1983 – Conspiracy to Deprive Civil Rights**
**(Against All Defendants)**

99.     Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

100.    Defendants, acting in their individual capacities and under color of law, conspired together and with others, and reached a mutual understanding to undertake a course of conduct that violated Plaintiff's civil rights.

101.    In furtherance of this conspiracy, Defendants used excessive force by deploying chemical agents against Plaintiff.

102.    In furtherance of this conspiracy, Defendants assaulted Plaintiff.

103.    As a direct and proximate result of the conspiracy between Defendants and others as described above, Plaintiff was subjected to assault; the use of excessive force; the deprivation of the right to be free from unreasonable search and seizure; and malicious prosecution.

104.    As a direct and proximate result of Defendants' actions, Plaintiff suffered and will continue to suffer physical pain and injury and emotional trauma.

105.    The acts described herein were intentional and callously indifferent to the rights of Plaintiff, thus entitling Plaintiff to an award of punitive damages against the Defendants.

106.    At all times, Defendants were acting under color of state law.

107.    If Plaintiff prevails, Plaintiff is entitled to recovery attorneys' fees pursuant to 42 U.S.C. § 1988.

**COUNT V**
**42 U.S.C. § 1983 – Municipal Liability**
***Monell* Claim against Defendant City of St. Louis for Failure to Train, Failure to Discipline, Failure to Supervise, and for a Custom of Conducting Unreasonable Search and Seizures and Use of Excessive Force**

108.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

109.    Defendant City is liable to Plaintiff pursuant to 42 U.S.C. § 1983 for the remaining Defendants' violation of Plaintiff's rights because the violations were caused by a policy, practice, or custom of the St. Louis Metropolitan Police Department. Among the SLMPD policies, practices, or customs that caused constitutional harm to Plaintiff are the following:

a.    SLMPD officers' routine use of excessive force when policing protests, especially those at which police brutality is being protested;

b.    SLMPD's policy or custom of issuing vague and even contradictory dispersal orders without giving an opportunity to comply;

c.    SLMPD's policy of arbitrarily declaring unlawful assemblies in the absence of any threat or force or violent activity that provides no notice to citizens or unlawful conduct;

d.    Additionally, SLMPD has a custom, policy, or practice of violating the Fourth Amendment by regularly conducting unreasonable seizures and arresting individuals without probable cause.

110.    Further, Defendant City has inadequately trained, supervised, and disciplined SLMPD officers, with respect to its officers' use of force.

111.    In its failures, Defendant City has been deliberately indifferent to the rights of citizens, and these failures and policies are the moving force behind, and direct and proximate cause of, the constitutional violations suffered by Plaintiff as alleged herein.

112.    As a direct result of the Defendant City's failures and policies as described herein, Plaintiff suffered damages including: physical injury, fear, apprehension, and concern for Plaintiff's own safety.

113.    If Plaintiff prevails, Plaintiff is entitled to recovery attorneys' fees pursuant to 42 U.S.C. § 1988.

### COUNT VI
**Missouri State Law § 565.056 – Assault in the Fourth Degree
(Against Defendant Olsten)**

114.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

115.    The brandishing and deployment of chemical agents for no lawful reason by Defendant Olsten caused Plaintiff to experience apprehension of immediate physical injury.

116.    As a direct result of the conduct of Defendant Olsten described herein, Plaintiff suffered damages including: apprehension, fear, concern for Plaintiff's own safety, and physical injury.

117.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

118.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide

the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters . . . ."

119.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

120.    The actions of Defendants as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

<u>COUNT VII</u>
**Missouri State Law – Intentional Infliction of Emotional Distress**
**(Against All Defendants)**

121.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

122.    By surrounding, assaulting Plaintiff and spraying Plaintiff with a chemical agent, without probable cause, Defendants committed acts that rose to the level of extreme or outrageous conduct that goes beyond the possible bounds of decency, so as to be regarded as atrocious and utterly intolerable in a civilized community.

123.    Defendants' actions were intentional or, at best, reckless.

124.    Such actions by Defendants have caused Plaintiff severe emotional distress that has resulted in bodily harm, as described above.

125.    Defendants' sole motivation was to cause emotional distress to Plaintiff and the other people Defendants' unlawfully arrested.

126.    As a direct result of the conduct of Defendants described herein, Plaintiff suffered damages including: physical injury, emotional trauma, great concern for Plaintiff's own safety;

fear, apprehension, depression, anxiety, consternation and emotional distress; lost time; loss of employment opportunity; and loss of faith in society.

127.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

128.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters . . .."

129.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

130.    The actions of Defendants as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**<u>COUNT VIII</u>**
**Missouri State Law – Negligent Infliction of Emotional Distress**
**(Against All Defendants)**

131.    Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

132.    Alternative to Count VII, above, by assaulting Plaintiff and spraying Plaintiff with pepper spray, Defendants realized or should have realized that their conduct posed an unreasonable risk to Plaintiff.

133.    Further, Plaintiff was reasonably in fear for his own person because of the actions of Defendants and suffered emotional distress or mental injury that is medically diagnosable and sufficiently severe to be medically significant as a result of Defendants' actions.

134.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

135.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters . . .."

136.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

137.    The actions of Defendants as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

## COUNT IX
### 42 U.S.C. § 1983 – Fourth and Fourteenth Amendment: Excessive Force
### (Against Defendant Olsten)

138.    Plaintiff incorporates by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

139.     Defendant engaged in these actions willfully and knowingly, acting with reckless or deliberate indifference to the Plaintiff's Fourth Amendment rights. As a direct and proximate result of Defendants' unlawful actions, Plaintiff was damaged.

140.     The use of force against Plaintiff, by assaulting Plaintiff and spraying Plaintiff with pepper spray, was objectively unreasonable and constituted excessive force.

141.     As a direct result of the conduct of Defendants described herein, Plaintiff suffered physical injury and emotional trauma.

142.     At all times, Defendants were acting under color of state law.

143.     If Plaintiff prevails, Plaintiff is entitled to recover attorneys' fees pursuant to 42 U.S.C. § 1988.

**COUNT X**
**Missouri State Law – Battery**
**(Against Defendant Olsten)**

144.     Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

145.     During the process of being unconstitutionally arrested, Plaintiff suffered battery at the hands of Defendant.

146.     In spraying Plaintiff directly with pepper spray, Defendant caused further intentional and offensive bodily contact.

147.     Namely, Defendant's physically aggressive tactics caused intentional and offensive bodily harm to Plaintiff.

148.     As a direct result of Defendant's conduct described herein, Plaintiff suffered damages including: physical injury, emotional trauma, great concern for Plaintiff's own safety; fear, apprehension, depression, anxiety, consternation and emotional distress.

149.    Defendant City of St. Louis obtains insurance from the Public Facilities Protection Corporation, a not for profit corporation into which the City pays funds yearly. The funds are later disbursed by the corporation to pay claims against the City.

150.    Alternatively, the City's relationship with the PFPC serves as a self-insurance plan. The 2017 Comprehensive Annual Financial Report for the City of St. Louis, Missouri states "[t]he PFPC is reported as if it were part of the primary government because its sole purpose is to provide the City with a defined and funded self-insurance program for claims, judgments, and other related legal matters . . .."

151.    By possessing such insurance or self-insurance, the City has waived sovereign immunity on state claims pursuant to § 537.610.1, RSMo.

152.    The actions of Defendants as described above were carried out in bad faith and with malice, and done with actual, wanton intent to cause injury, such that punitive damages should be awarded to punish Defendants and to deter them, as well as other similarly-situated individuals, from engaging in similar conduct in the future, in an amount to be determined by a jury.

**WHEREFORE**, Plaintiff prays for judgment in favor against all Defendants for compensatory damages, punitive damages, attorneys' fees, expenses, costs, and for any other relief this Court deems just and appropriate.

Date: October 2, 2018                    Respectfully Submitted,

**KHAZAELI WYRSCH LLC**

/s/ James R. Wyrsch
James R. Wyrsch, MO53197
Javad Khazaeli, MO 53735
Kiara Drake, MO 67129
911 Washington Avenue, Suite 211
St. Louis, MO 63101
(314) 288-0777

(314) 400-7701 (fax)
james.wyrsch@kwlawstl.com
javad.khazaeli@kwlawstl.com
kiara.drake@kwlawstl.com